**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BMO HARRIS BANK, N.A., as Administrative Agent <br><br> Plaintiff, <br><br> v. <br><br> PRINCIPIS CAPITAL LLC, AND FF2 CORP., <br><br> Defendants. | Civil Docket No. _____ <br><br><br> **COMPLAINT** |

NOW COMES Plaintiff BMO Harris Bank N.A., in its capacity as Administrative Agent under the Credit Agreement (defined below) (hereafter *"Administrative Agent"* or *"BMO"*), by counsel, against Principis Capital LLC (*"Principis"* or *"Borrower"*), a New York limited liability company, and FF2 Corp. (*"FF2"* or *"Holdings"*), a New York corporation (Principis and FFC are collectively referred to herein as the *"Defendants"* and individually as a *"Defendant"*), and respectfully states the following as its Complaint in this matter:

### INTRODUCTION AND STATEMENT OF THE CASE

In addition to two straightforward breach of contract claims against a borrower and guarantor who are in default of their loan obligations, which loan (currently exceeding $25 million) has also now matured, BMO seeks the appointment of a receiver to manage the borrower's assets that have been pledged to BMO and other lenders to secure repayment of the loan.   The Borrower's business, which consists primarily of merchant cash advance contracts (as more fully described below), is in severe financial distress. Compounding the precariousness of the situation, the Borrower's management team has furloughed the employees and essentially abandoned the business, in particular the servicing/collecting on certain contracts from merchants which stand as the primary source for repayment of the loan, leaving this

collateral to wither away.    For this reason, BMO also seeks the appointment of a receiver on an expedited basis.

## PARTIES, JURISDICTION, AND VENUE

1.      BMO is a national banking association with its main office located in Chicago, Illinois. As explained in more detail below, BMO brings this action as Administrative Agent under a Credit Agreement (as further defined below).

2.      Principis is a New York limited liability company located at, upon information and belief, 132 West 31st Street, Suite 1301 ,New York, New York 10001.   Principis also maintains an office at 111 Town Square Place, Suite 700, Jersey City, New Jersey 07310.   The sole member of Principis is FF2, which, as described below, is a New York corporation.

3.      FF2 is a New York corporation located at, upon information and belief, 132 West 31st Street, Suite 1301, New York, New York 10001.

4.      These allegations are based on diligent inquiry as to Principis' and FF2's home states, and further rely on representations made in the Credit Agreement and the negotiations preceding it regarding Defendants' addresses, states of incorporation, and those entities having membership interests in Principis.

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) as the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      This Court has personal jurisdiction over the Defendants because they are located in this District, conduct substantial commercial activity in this District, maintain an office in this District, and have submitted to the jurisdiction of this Court under the terms of the Credit Agreement.

7.      Venue is proper in this Court as the Defendants are located in this District and each has, under the terms of the Credit Agreement, submitted to the jurisdiction of this Court and therein contractually waived all objections to judicial process in this Court.

### BACKGROUND AND RELEVANT FACTS

**A.    THE UNDERLYING LOAN**

8.    On or about August 1, 2014, Principis (as Borrower) entered into that certain Credit Agreement with BMO, as Administrative Agent, which was subsequently amended pursuant to that certain First Amendment to Credit Agreement dated February 10, 2016, Second Amendment to Credit Agreement dated November 28, 2016, Third Amendment to Credit Agreement dated January 31, 2017, Fourth Amendment to Credit Agreement dated March 31, 2017, and Fifth Amendment to Credit Agreement dated July 28, 2017 (as amended, the *"Credit Agreement"*), pursuant to which BMO and First Horizon Bank, a Tennessee banking corporation and successor to First Tennessee Bank National Association ("*First Horizon*"), as Lenders, extended a $55 million revolving line of credit to Principis.   A true and correct copy of the Credit Agreement is attached hereto as Exhibit A.

9.    In connection with the Credit Agreement, Principis executed (1) an Amended and Substitute Revolving Note dated July 28, 2017, payable to BMO in the principal amount of $40,000,000.00 (the *"BMO Revolving Note"*); (2) a Revolving Note dated July 28, 2017, payable to First Horizon in the principal amount of $15,000,000.00 (the *"First Horizon Revolving Note"* and, together with the BMO Revolving Note, collectively the *"Revolving Notes"*); (3) a Security Agreement dated August 1, 2014 in favor of the Administrative Agent (the *"Security Agreement"*), which granted to BMO, as Administrative Agent, a security interest in substantially all assets of Principis to secure the Secured Obligations as defined therein, including all obligations of Principis to the Administrative Agent and the Lenders under the Credit Agreement and the Revolving Notes, whether now existing or hereafter arising; and (4) a Pledge Agreement dated August 1, 2014 in favor of the Administrative Agent (the *"Pledge Agreement"*), which granted to BMO as Administrative Agent a security interest in the equity interests issued by FF 2009-8 LLC and FF 2009-9 LLC to Principis to secure the Secured Obligations as defined therein, including all obligations of Principis to the Administrative Agent and the Lenders under the Credit Agreement and the Revolving Notes, whether now existing or hereafter arising.   True and correct copies of the Revolving Notes, the Security Agreement, and the Pledge Agreement are attached hereto as Exhibits

B, C, and D respectively.

10.     In connection with the Credit Agreement, FF2 executed a Limited Recourse Guaranty and Pledge Agreement dated August 1, 2014 (the *"Guaranty"*) in favor of the Administrative Agent pursuant to which FF2 guaranteed, on a limited recourse basis, the full and prompt payment of 100% of the Obligations as defined therein, including all obligations of Principis to the Administrative Agent and the Lenders under the Credit Agreement and the Revolving Notes, whether now existing or hereafter arising. A true and correct copy of the Guaranty is attached hereto as Exhibit E.

11.     Additionally, and in connection with the Guaranty, FF2 pledged as collateral securing its obligations under the Guaranty its membership interests in Principis, which account for 100% of the membership interests in Principis.

12.     Under the Guaranty, recourse against FF2 is limited to its pledged equity interests in Principis.

13.     Under the Security Agreement, Principis pledged to the Administrative Agent as collateral to secure the Secured Obligations (as that term is therein defined), a continuing security interest in substantially all of Principis' assets including, but not limited to: accounts, chattel paper, instruments, general intangibles, deposit accounts, investment property, inventory, equipment, fixtures, and all other personal property as well as all proceeds thereof (together, the *"Collateral"*).   *See* Exhibit C, at Section 2.

14.     Apart from the Credit Agreement, Revolving Notes, Security Agreement, Pledge Agreement, and Guaranty, Defendants executed a number of other collateral agreements, subordination agreements, and security agreements (together referred to as the *"Loan Documents"*).

15.     BMO's interest in the Collateral was perfected through its filing of a UCC-1 Financing Statement with the New York Secretary of State on July 31, 2014.   A continuation of same was filed on June 17, 2019 continuing BMO's first priority security interest in the Collateral.

**B.     THE EVENTS OF DEFAULT**

16.     As summarized most recently in a Default Letter dated August 3, 2020 that was sent to Defendants in accordance with the applicable notice provisions of the Credit Agreement, Defendants are

in default of their obligations under the Credit Agreement, which defaults include, but are not limited to: (1) the failure to repay the loans in full on the final maturity date (August 1, 2020) as required by Section 2.5 of the Credit Agreement, which constitutes an Event of Default under Section 9.1(a) of the Credit Agreement; and (2) the failure to reimburse the Administrative Agent for certain costs and expenses as and when required by Section 13.4 of the Credit Agreement (the *"Payment Defaults"*).

17.     In addition to the Payment Defaults, Defendants have been in default under the Credit Agreement beginning no later than January 15, 2020, which defaults include: (1) failure to comply with the limitation on loans and advances to an affiliate, Northern Leasing Systems, Inc., pursuant to Section 8.9(i) of the Credit Agreement, resulting in an Event of Default under Section 9.1(b)(i) of the Credit Agreement; (2) the payment of management fees during the pendency of an Event of Default, which is a violation of Section 8.12(ii) of the Credit Agreement; (3) the payment of Subordinated Debt (as that term is defined in the Loan Documents) during the pendency of an Event of Default, which is a violation of Sections 8.12(iii) and 8.22 of the Credit Agreement; (4) the payment of dividends or distributions during the pendency of an Event of Default, which is a violation of Section 8.12(iv) of the Credit Agreement; and (5) the failure to cure a borrowing base deficiency as required by Section 2.6(b)(ii) of the Credit Agreement, which is an Event of Default under Section 9.1(a) of the Credit Agreement (together with the Payment Defaults the *"Existing Defaults"*).

18.     On August 3, 2020, the Administrative Agent, at the direction of the Lenders, delivered the Default Letter demanding payment for all obligations due under the Credit Agreement, Revolving Notes, and other Loan Documents.   A true and correct copy of that Default Letter is attached hereto as Exhibit F.

19.     The Administrative Agent has performed all of its obligations under the Credit Agreement and other Loan Documents.

## C.     THE ADMINISTRATIVE AGENT'S REMEDIES

20.     As a result of the Existing Defaults, the Administrative Agent (on behalf of the Lenders) is, under Section 9.2 of the Credit Agreement, entitled to exercise any and all default-related rights and remedies under the Credit Agreement, other Loan Documents, or which are available under law or equity.

21.     Under Section 10.11 of the Credit Agreement the Administrative Agent is granted the exclusive power to, on behalf of the Lenders, "institute any suit, action, or proceeding in equity or at law . . . **for the appointment of a receiver**" (emphasis added).

22.     Under Section 10(c) of the Security Agreement, the Administrative Agent is empowered to, upon and during the pendency of an Event of Default, "take physical possession of any and all of the Collateral and anything found therein . . . and the right to maintain such possession on any Debtor's premises or to remove the Collateral . . . to such other places as the Administrative Agent may desire."

23.     Under Section 9 of the Security Agreement, upon and during the pendency of an Event of Default, the Administrative Agent or its nominee is appointed as the Defendants' attorney-in-fact with the power to, among other things "sign the Debtor's name on verifications of Receivables and other Collateral," "endorse the Debtor's name on any checks, notes, acceptances, money orders, drafts or [other instruments]," and "take such actions necessary to carry out this [Security Agreement]."

24.     The power of attorney under Section 9 of the Security Agreement is irrevocable unless and until the Obligations under the Loan Documents are fully paid and satisfied.

**D.     THE IMMEDIATE NEED FOR A RECEIVER**

25.     According to its own representations to the Administrative Agent, Principis will not be able to pay its matured Obligations under the Loan Documents.

26.     Further, after numerous threats to shutter the business and hand the Administrative Agent the proverbial "keys," management for Principis has furloughed its employees and vacated its office.  *See* Declaration of Joan Murphy (the *"Murphy Decl."*) ¶¶ 35–37, attached as Exhibit 1 to the Memorandum of Law in Support of Plaintiff's Emergency Motion for Appointment of Receiver for Principis Capital LLC.

27.     Principis' management indicated that it would make good on its threat to close the business on August 6, 2020.

28.     On August 7, 2020, counsel for Principis wrote to counsel for the Administrative Agent stating that Principis did not consent and in fact objected to any attempt by the Administrative Agent to

repossess the collateral.

29.     On August 10, 2020, Principis informed the Administrative Agent that it had furloughed its employees and that they were not in the office on August 7, 2020 (the previous business day) nor was the office occupied on August 10, 2020.

30.     As briefly summarized above, Principis is in the "merchant cash advance" business, which provides small businesses such as restaurants and beauty parlors with immediate cash in exchange for a portion of those business' future receivables under what are commonly called "merchant cash advance contracts" (an *"MCA"* or *"MCAs"*).

31.     The success of this business therefore depends greatly on frequent communication and hands-on servicing.

32.     One of the primary purposes of the close communication between Principis and its customers is to inform the customer precisely what amount of receivables should be remitted to Principis under each particular MCA.

33.     The administration and tracking of these MCAs are maintained at Principis; such that the customer typically does not maintain these records.   Thus, the customer relies on Principis to track what it owes.

34.     To administer and track the MCAs, Principis uses its proprietary servicing platform, which is a combination of unique software and personnel with intimate knowledge of Principis' customers, their business practices, their shifting financial position during the pandemic, and their key contacts.

35.     This tracking and monitoring of the MCAs on the servicing platform is even more important during the COVID-19 pandemic, as customers have been modifying and tweaking their individual MCAs for months, the records of which were and are kept in Principis' files.

36.     The fact that so many of Principis' customers are experiencing financial distress during the pandemic is an additional reason that frequent communication and servicing is crucial, as those small businesses' operations experience significant volatility in this climate.

37.     Management for Principis has also acknowledged to the Administrative Agent that Principis has ceased originating any new MCAs and is only servicing its existing portfolio.   Murphy Decl. ¶ 24.

38.     This is even further reason that servicing must continue without interruption, as the future revenue available to Principis, and thus available to the Administrative Agent as collateral, is now a fixed sum.

39.     The immediate appointment of a receiver is therefore necessary to prevent imminent danger to the Collateral in the form of the MCAs from being lost, squandered, or diminished in value.

40.     As alleged above, the Collateral, primarily in the form of merchant cash advances, requires continual servicing, and Principis employs a number of servicers whose primary job duty is to maintain regular communications with it customers to assure that payments are made by the customer on a timely basis and into a bank account specified by Principis, which in turn has also been pledged to BMO pursuant to a deposit account control agreement.

41.     With Principis having ceased operations, its customers have no way of knowing what they owe on their MCAs.   This is likely already causing a precipitous drop in revenue, endangering Principis' status as a going concern and the Collateral, which stands as the main source of repayment.

42.     Further, without a receiver to ensure management's smooth exit, Principis would risk losing furloughed employees permanently as they seek out new employment, and with them vast and irreplaceable institutional knowledge of Principis' servicing procedures, particular customers records, knowledge of Principis' software, and other crucial information necessary to preserve Principis' business operations and therefore the Collateral.

43.     Legal remedies available to the Administrative Agent will not suffice to immediately protect the Collateral following the anticipated abandonment by Principis' management team.

44.     The probability of harm to Principis by the appointment of a receiver is greatly outweighed by the probability of harm to the Administrative Agent and the Lenders it represents should a receiver not be immediately appointed and the Collateral be left to waste away.   Indeed, with Principis having already

shuttered its doors, the appointment of a receiver to restart business operations can only improve the situation.

45.     The Administrative Agent's right to a receiver is further bolstered by the fact that there can be no meaningful doubt about Defendants' obligations under the Loan Documents or their failure to repay those obligations.

46.     While the Administrative Agent is all but guaranteed to prevail on its breach of contract actions against those parties, it will be a "pyrrhic" victory unless a receiver is in place to preserve the Collateral during the pendency of this action.

## COUNT I
### (Breach of Contract against Principis)

47.     The Administrative Agent incorporates all previous paragraphs by reference as if set forth in full herein.

48.     The Administrative Agent has performed all of its obligations pursuant to the Credit Agreement and the Loan Documents.

49.     Principis has breached its obligations under the Credit Agreement (the *"Events of Default"*) and has failed to repay its Obligations, which Obligations have also now matured under the Loan Documents.

50.     Administrative Agent has notified Principis of these Events of Default pursuant to the notice provision in the applicable Loan Documents and these Events of Default continue.

51.     As of August 3, 2020, the outstanding balance due under the Credit Agreement is $25,367,327.75.   Murphy Decl. ¶ 22.

52.     As a result of Principis' breach of the Credit Agreement and related Loan Documents, the Administrative Agent is entitled to recover from Principis on these loans a total of $25,367,327.75 plus existing and further accruing interest, attorneys' fees, and costs.

WHEREFORE, BMO Harris Bank N.A., as Administrative Agent, respectfully prays for entry of judgment against Defendant Principis Capital LLC on Count I of the Complaint in an amount no less than

$25,367,327.75, plus any other existing and further accruing interest, attorneys' fees, and costs, and for any such other or further relief that this Court finds just and proper under the circumstances.

## COUNT II
### (Breach of Contract against FF2)

53.     The Administrative Agent incorporates all previous paragraphs by reference as if set forth in full herein.

54.     The Administrative Agent has performed all of its obligations pursuant to the Credit Agreement and the Loan Documents.

55.     FF2 guarantees all of the Obligations under the Guaranty, which are now past due and owing.

56.     The Administrative Agent has notified FF2 of the past due Obligations and the other Events of Default pursuant to the notice provision in the applicable Loan Documents and these Events of Default continue.

57.     As a result of the Events of Default, the Administrative Agent is entitled to recover from FF2 all of the Obligations, plus further accruing interest, attorneys' fees, and costs, subject to the limitations on recourse to the equity interests of Principis as set forth in the Guaranty.

WHEREFORE, BMO Harris Bank N.A., as Administrative Agent, respectfully prays for entry of judgment against Defendant FF2 Corp in an amount no less than $25,367,327.75, plus any other existing and further accruing interest, attorneys' fees, and costs, subject to the limitations on recourse to the equity interests of Principis as set forth in the Guaranty, and for any such other or further relief that this Court finds just and proper under the circumstances.

## COUNT III
### (Appointment of a Receiver against Principis)

58.     The Administrative Agent incorporates all previous paragraphs by reference as if set forth in full herein.

59.     As set forth above, the Collateral duly pledged to secure the Obligations under the Credit

Agreement and the other Loan Documents is in imminent danger of being lost, squandered, wasted, or significantly diminished in value due to management's imminent abandonment of Principis' commercial activities, including the servicing MCAs as described above.

60.    Legal remedies available to the Administrative Agent are insufficient to protect and preserve the Collateral from these imminent threats.

WHEREFORE, BMO Harris Bank N.A., as Administrative Agent, respectfully prays for an order appointing a receiver over all of Principis' assets to administer, monitor, and conduct Principis' commercial activities, and for any such other or further relief that this Court finds just and proper under the circumstances.

Date:   August 12, 2020
        Chicago, Illinois

                                    Respectfully submitted,

                                    BMO HARRIS BANK N.A., as Administrative Agent

                                    By: _____ /s/ Joseph P. Lombardo _____
                                                One of Its Attorneys

David T.B. Audley (*pro hac vice* forthcoming)
Joseph P. Lombardo (NY Bar No. 5447743)
Eric Silvestri (*pro hac vice* forthcoming)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
(312) 845-3000
audley@chapman.com
lombardo@chapman.com
silvest@chapman.com